CHANCERY.                **Thomas and wife *vs* Hite.**

*Case* 122.              ERROR TO THE NELSON CIRCUIT.

*Guardian and ward.   Bill in chancery.   Frauds.   Trustees.   Pleadings.*

*June* 10.      JUDGE MARSHALL delivered the opinion of the Court..

Case stated by complainant and prayer of the original bill.

IN July, 1838, Martha Ann Bowling, now the wife of Thomas, commenced her action of ejectment in the name of John Doe, for the recovery of one half of lot No. 94, in Bardstown, which was in the possession of Thomas Hite or his tenants.   In March, 1839, the same M. A. Bowling, by her next friend, filed her bill in chancery against Hite for the same property, praying for a division and for an account of rents, &c.   The bill alledges that Hite, on the 12th day of April, 1832, obtained a conveyance of one half of the lot from James Green, who owned it, and who was the guardian of the complainant, and the administrator of her father, who had owned the other half of the lot; that said Hite, knowing her to be the owner of one half of the lot, and holding a note on her deceased father for $58 97, which she charges was not just and owing, an arrangement was made between him and said Green, that Hite should recover judgment on the note without defence, and sell out her interest in the lot, which she avers to have been worth about $1,500, for the amount of the judgment.   She further shows, that on the said 12th of April, 1832, a written contract was made between Hite and Green, by which the latter, having already conveyed his own half of said lot, undertook to procure, and within one year, to convey to Hite the other half; and she charges that it was thus fraudulently agreed that Hite should sue on said note, obtain judgment, and by a sale procure her interest in said lot; that on the same day, the 12th of April, 1832, a writ was sued out against Green, as administrator, and herself as sole heir of John Bowling; that without any service of process on her, Green was appointed her guardian *ad litem,* and judgment went by default; that under the exe-

cution which issued, and under the fraudulent agreement before stated, Hite purchased her interest in the lot for the amount of the judgment, she being of tender years and ignorant of the transaction, and no person attending to her interest. The bill also avers that Hite took possession of the entire lot on the 12th day of April, 1832, and has had it ever since; that the rents, &c., are worth $150 a year, &c., and prays that the purchase by Hite, under execution, may be set aside as fraudulent, collusive, and illegal, and for a division and account, &c. and for general relief.

On the 12th day of March, 1840, Hite, after having unsuccessfully pleaded the ejectment suit in abatement, filed his answer, in which he says that some time in the year, 1832, (as he believes,) he took possession of lot No. 94, "in virtue of purchases of the entire interest of James Green and John Bowling;" he refers to the record of the suit of *Hite and Johnson* vs *Bowling's administrator and heirs,* "which will fully show the sale of the interest of John Bowling deceased." He then proceeded with a long and minute statement of the rents received and due, and of repairs made by him, and referring to an account exhibited, in which he charges $102, being 20 per cent. commissions for advancing, superintending, &c. he says the Court will find there is due to him on account of repairs, &c. on said lot, since 1832, the sum of $132 52 cents. He then "protests against a division of said lot as he owns the whole of the same;" he denies complainant's right to one cent received for rents; he "denies the complainant's right to conduct this suit against him, as there is another suit pending against him in this Court, for the same subject matter," and prays the bill may be dismissed.

On the 15th day of March, 1840, three days after the original answer was filed, Hite filed an amended answer in which he stated that at the then present term of the Court, a suit at law in the name of the complainant against him, was tried on its merits, and after a full and fair trial, a verdict and judgment were rendered for him in said case, wherein the same subject matter, and the same property was involved as is now involved in this

THOMAS & WIFE
*vs*
HITE

Answer of Hite thereto.

Amended answer relying upon a judgment in ejectment for the same half lot in bar of this suit.

THOMAS & WIFE
*vs*
HITE.

suit. He refers to the common law papers, and the verdict and judgment, which he says remain in full force, as a part of his answer, and pleads the same as a bar to the recovery of complainants in this suit.

Decree dismissing complainant's bill.

And at the succeeding June term, 1840, there being no replication to this plea, the record presents the following order: "This day came the parties by their counsel, and this cause came on to be heard, whereupon it is ordered and decreed that the bill be dismissed, and that complainant pay," &c. &c.

The judgment in ejectment reversed by this Court, new trial ordered and nonsuit therein.

The judgment referred to in the amended answer was rendered in the ejectment before mentioned, in which after a verdict for the plaintiff, a new trial had been granted, and at the March term, 1840, on a second trial, a verdict and judgment were rendered for the defendant. In October, 1840, this judgment was reversed by this Court, on the ground principally, that the Court had erred in excluding from the jury the question of fraudulent combination between Hite and Green, whereby the plaintiff's interest in the lot was sacrificed; and after the return of the cause to the Circuit Court, it came on for trial again at the March term, 1842, when after a day or two consumed in the trial, the plaintiff, being met by the decree dismissing her bill, which was decided by the Court to be a bar to any recovery in the ejectment, suffered a nonsuit to avoid a verdict against her; and at the same term, by leave of the Court, filed a bill of review.

Bill of review filed by complainant.

This bill, alledging that the complainant has good title to one half of lot No. 94, gives a brief history of the two suits, avers that her former bill was not tried on its merits, but was dismissed on the ground that the same matter had been tried, heard, and determined by a Court of Law having concurrent jurisdiction; and charges that the suit at law had been pleaded to the suit in chancery, and then the suit in chancery pleaded to the suit at law and sustained in both instances, and "thus she is lawed out of Court in both instances, without a hearing on the merits in either." The reversal of the judgment in ejectment since the dismissal of the bill, is referred to as furnishing "good ground to open and review the suit in chancery so dismissed as aforesaid," and the complainant "prays to

file this in the nature of a bill of review, that the said decree be opened that she may dismiss the same without prejudice to a trial at law, or may be permitted to try her equity in chancery;" and prays also for general relief. The common law record and all papers and exhibits used on the various trials, and the opinion and mandate of this Court, and all other orders in the cause, are made part of the bill, and together with the original suit in chancery, form a part of the record now before us.

The answer denies that the former bill was dismissed on the ground that the same matter had been determined at law, but alledges that the case was heard and decided on the merits, and that it is so entered on the record; and the defendant "protests against opening the suit in chancery referred to, which has been once fully tried on its merits."

As we are satisfied that the judgment in ejectment, which was pleaded as a bar to the chancery suit, could not properly have operated as a bar, because the bill of exceptions showed that the question of fraud was excluded, we think it clear that the reversal of that judgment, after the decree, does not necessarily and of itself constitute a ground for opening the decree. But the gravamen of the bill of review is, that the judgment at law was pleaded and allowed as a bar to the bill in equity, and that the bill was dismissed on this ground, without a trial on the merits. This and the effect of the decree which while it stands, may preclude all inquiry into the merits of the complainant's claim, constitute the grievance complained of, and the opening of the decree, so that it may no longer constitute an obstacle to the assertion of the claim on its merits, is the immediate relief sought by the bill. If the reversal after decree, of the judgment which was erroneously made to produce the decree, be not in itself a sufficient ground for opening the decree, it certainly tends to demonstrate the injury done in making the judgment operate as a bar in equity, since the very ground of the reversal shows that it ought not so to have operated. And although the complainant be mistaken in supposing that the reversal of the judgment is of itself good cause for opening the decree, certainly this mistake

*Margin notes:*

Thomas & wife vs Hite.

Answer to the bill of review.

Where the grounds of relief sought by bill are insufficient; yet if other grounds of the same character be well alledged the Chancellor should not withhold the same relief.

THOMAS & WIFE
*vs*
HITE.

Where an action of ejectment and a suit in chancery also, was commenced to recover the possession of a lot which was alledged to have been fraudulently obtained, the defendant in the suit in chancery amended his answer relying upon a verdict in his favor in the action of ejectment—Held that as the bill of exceptions filed in that cause showed that the fraud relied on by plaintiff had been excluded from the consideration of the jury that it presented no bar to the relief sought on that ground in the suit in chancery.

should not deprive her of the benefit of other allegations of the bill, which may constitute proper ground for the same relief.

There is no doubt then upon the face of this bill, and of the mandate of this Court to which it refers, that there was error in allowing the judgment in ejectment as a bar to the suit in chancery, and in thus shutting out the merits of that suit. And if upon the merits the complainant had an equitable claim to relief, the error was obviously prejudicial, and entitles her to a reversal of the decree. It is true, the bill of review does not alledge specifically, that the Chancellor *erred in allowing* the bar, or that he *erroneously* or *improperly* dismissed the bill without deciding on the merits and on the sole ground that it was barred by the judgment. But it alledges, and obviously by way of complaint, that the bill was dismissed on that ground, and that there had not been a trial on the merits, either at law or in equity. By these allegations, confirmed by the record of the ejectment and the mandate of this Court, it shows that the bar was erroneously allowed; and it would be a most rigid adherence to technicality not consonant with the liberality now prevalent in our chancery proceedings, if when the complainant shows an error in the former decree, and complains of it in her bill of review, she cannot have the benefit of it as a ground of opening the decree, because she has not applied to it the term "error" or "erroneously," or "improperly." The very essence of her complaint, the grievance on account of which she files her bill, is "that she has been lawed out of both Courts without a hearing on the merits in either;" and if, because she has not, in so many words, called this an error, the merits are to be still kept out of view, and her claim is in effect, to be extinguished, as it would be by lapse of time, which now bars her writ of error to the decree, the proceedings upon this bill of review would scarcely tend to free the law from the reproach which she has cast upon it.

Where an original bill charged *fraud* which was not denied either generally or spe-

We are of opinion, therefore, that upon the face of the bill, a case is made out for opening the former decree and looking into the merits of the original case; and we consider the bill of review as charging substantially, that the

former bill was dismissed without regard to the merits, on the ground that the case was decided by the judgment at law. This charge is denied by the defendant, who avers that the bill was heard and decided on the merits, and refers to the record to prove it. But although the defendant expressly admits what though true is not charged in the bill, that he had pleaded the pendency of the action of ejectment in abatement of the suit in chancery, and that the plea was adjudged bad on demurrer, he makes no reference to the fact charged by the bill, and proved by the record, that he had relied on and pleaded the judgment in ejectment as a bar to the suit in chancery; but proceeding immediately, after stating that the plea in abatement was adjudged bad, to say, "and afterwards the said suit in chancery came up to be heard upon its merits," &c., intends apparently to produce the impression that the ejectment suit had only been relied on as matter of abatement, and that having proved ineffectual for that purpose, it was not referred to or relied on for any other. Now while a hearing, following immediately upon the judgment on demurrer, against the plea in abatement, and without any intermediate reference to the ejectment, might be presumed to have been had irrespective of that suit, a hearing following upon a plea in bar relying on the judgment in ejectment, must have been had, in part at least, upon that plea; and the dismissal of the bill would be the proper consequence of the opinion, and to that the judgment was a bar, as well as of the opinion, that there were no merits in the case, and the general decree of dismissal, without referring to the cause is, therefore, in itself, no more evidence of its having been made on the one ground than of its having been made on the other. But the plea averring that the judgment in ejectment was rendered on the merits, and involved the same subject matter and the same property, was *prima facie,* a good bar to the relief sought by the bill. It is true the record of the ejectment is referred to, and that shows that the question of fraud was not litigated at law, and therefore, that the same subject matter on which the complainant relied in her bill, had not been tried and decided against her in the ejectment; but it does not appear that the record of the

THOMAS & WIFE
*vs*
HITE.

cially by the answer, on filing amended answer setting up a judgment in ejectment in favor of defendant for the same land, sought to be recovered by the bill, to which there was no response, and thereupon a decree rendered dismissing the bill—Held that the inference is that the Court adjudged the matter of the amended answer as a valid bar to the recovery sought, and did not decide the case upon the merits.

Thomas & wife
       vs
    Hite.

ejectment was used on the hearing of the bill; and the plea being positive in its averments, and not replied to, may have been taken as true; or the Chancellor knowing that the common law Judge had excluded the question of fraud, might still have supposed that the judgment in ejectment for the defendant, was a bar to the recovery of the same land by bill in chancery, and that if there was error in the judgment, the only remedy was to reverse.it. Be this as it may, the general entry of the hearing and dismissal of the bill, following immediately upon the unanswered plea, certainly leads to the inference, (and scarcely admits of any other,) that the bill was dismissed upon the matter of the plea; and although upon these premises alone, this inference might not be conclusive, and 'although as its adoption might convict the Chancellor either of inadvertence or error of judgment, it should not be adopted if it can be avoided, still as upon looking into the merits of the case upon the original bill, we see that the alledged fraud is not even denied by the answer, either in special or general terms, and that the proof then in the cause went strongly to sustain the bill, while there was no evidence to disprove the facts charged, or to repel the inference of fraud, and no issue having been made upon the allegations of fraud, there was in strictness, no right to make such proof, we should feel bound to adopt any conclusion consistent with the record, as to the ground of dismissing the bill, rather than suppose that it was 'dismissed upon the merits of the case then appearing. Upon the whole record, we consider the ground of the actual dismissal as certain as if there had been no answer to the original bill, except the plea of the judgment, or as if the first answer had expressly admitted the fraud, or as if the entry on the record had stated that the Court being of opinion that the plea was sufficient, therefore dismissed rhe bill.

The allegation of the bill of review, that the original bill was dismissed upon the ground of the judgment in ejectment, and without a decision on the merits being thus substantiated, and it being as already shown, clear that the bill should not have been dismissed, either on the merits or on the ground of the judgment pleaded in

bar, the proper effect of the bill of review should have been to open the case for such further preparation as was necessary, after which, upon final hearing, it should have been decided according to the principles of equity upon the whole record. And as the defendant, in his answer to the bill of review, went on to answer and deny the allegations of fraud made in the original bill, but not before denied, and even answered and denied particular facts which had not been alledged, but had been detailed by the complainant's witness in the original cause, and as further testimony by depositions, was introduced by both parties, and the cause was finally submitted a year after the filing of the answer, without objection or any suggestion that further preparation was necessary, or could be made, we are of opinion that upon this writ of error to the decree dismissing the bill of review, and upon the assignment of error, the Court should have decreed to the complainant one half of the lot, &c., and should have appointed Commissioners, &c. The whole case is before us for final decision upon the merits, which we now proceed more fully to state and consider.

The general ground upon which this Court reversed the judgment in ejectment, rendered in favor of Hite, has been already stated. In the opinion then rendered, (*Mss. op. October 27, 1840,*) the Court withholding any opinion as to the true conclusion from the evidence, on the ground of fraud, proceed to say, that it certainly conduces ''in some degree to the conclusion, that an understanding, express or implied, between Hite and the guardian, Green, that the former should acquire the ward's moiety of the lot for an inconsiderable sum, and in that way the latter might be exonerated from his obligation to procure for him the title, induced Green to abandon his trust as guardian, and connive at a sale under execution, for a sum comparatively nominal, and that thus, by such collusion, the ward's interest was sacrificed.'' And the opinion then decides, that if this deduction should be established, the Sheriff's deed should be disregarded in the action by the ward for her moiety. If, as is certainly the case, this be a sufficient ground for disregarding the deed at law, much more must it be deemed sufficient in equity for

*Margin notes:*

THOMAS & WIFE
*vs*
HITE.

Fraud in the sale of land under execution is a sufficient ground with the Chancellor to set aside the sale; and on a bill alledging such grounds not denied, complainant should have a decree.

THOMAS & WIFE
*vs*
HITE.

setting aside the deed, and restoring the ward to her estate on equitable terms. Many cases have established the doctrine in this State, that fraud in a sale under execution, whereby land has been acquired at a great sacrifice, is a sufficient ground for avoiding the purchase in equity, and the case of a fraudulent combination, involving a breach of trust, whereby such a sacrifice is produced, presents peculiar claims to the interposition of the Chancellor.

Facts appearing in the cause establishing the fraud alledged between Green, the guardian of the wife of Thomas, and Hite, the defendant. An adm'r who was also guardian, by his instrumentality, active as well as passive, aided a creditor in effecting a sale at great sacrifice, the real estate of the ward to pay a large debt of his own, as well as a small debt against the decedent—Held to be fraudulent, and set aside by the Chancellor.

The substance of the original bill is, that there was such a combination between Hite and Green, the latter being the guardian of the infant heir, whose estate was to be acquired, and the administrator of the ancestor, for whose alledged debt it was to be sold, and that the consequence was, the fraudulent sale and sacrifice of her estate for less than a tenth of its known value. This charge is admitted by the original answer, not only by its failure to deny either the facts or the conclusion from them, but by its long detail of the expense and trouble of repairs, and of the successive tenants, and the failure of some of them to pay, which, indicating a consciousness that these are to be matters of practical importance in the suit, gives to the answer almost the force of an express admission. With this as the only answer to the merits, it was certainly not incumbent on the complainant to have produced any proof beyond the exhibits referred to, in support of the alledged fraud, and in strictness the defendant had no right to deny, by proof or argument, facts which he had admitted by his pleading. The complainant however, had taken, before her original bill was dismissed, the deposition of Green, the alledged participant in the fraud, who states many facts going to establish it, and also of several persons who were in Bardstown on the several Court days, when the sales of the lot in question were made, two of them residing in the town, and one of them living on the public square, who all say they had not heard of either one of the sales, (there having been three) until it was over. The defendant had taken no deposition, and had adduced no testimony, except by reference in his original answer to the record of the judgment and executions under which he had purchased, and in his amended answer to the record of the ejectment, which

he pleaded in bar. This record, with every paper used on each of the trials, is also referred to as a part of the bill of review, and the only additional testimony taken after that bill was filed, consists, on the part of the defendant, of the deposition of the Sheriff who made the sale, who states in general terms, that it was made fairly, and in the usual way, upon due advertisement, and that it was made at the Court house, on the side next to the property for sale. And the depositions of several persons, who state that Green was a very old man, (about 70 years of age,) that for two or three years, or for some years, he had been losing his mind and memory, and that he was then, (that is, about three years after his deposition was taken,) entirely insane. As many or more depositions, stating that at the time of giving his deposition, Green was of sound mind, and of memory as good as ordinarily belongs to men of his age, constitute the only additional testimony on the part of the complainant.

The answer to the bill of review is as prodigal as the original answer had been sparing of denials. And these denials are made without one word of explanation or excuse, to show why they were not made in the original answer, which was not filed until after Green's deposition was taken, nor until after the rendition of the verdict and judgment in ejectment, which were set up by amended answer in bar of the suit in Chancery. But in the interval between the answer to the original bill and this answer to the bill of review, the original bill had been dismissed, on the ground that it was barred by the judgment in ejectment, and after the reversal of that judgment, the ejectment had been defeated, on the ground that it was barred by the dismissal of the bill. A double success had thus given strength to the title of Hite. The fraud which had not been denied in the suit in chancery, which this Court thought was sufficiently proved in the ejectment to have authorized a verdict against that title, had been kept out of view in the decision of both cases, and the only witness who could make direct proof of it, had become unsound in mind and memory. Still, if the case in chancery should be opened for re-trial, under the bill of review, the estate which had been thus apparently

secured, and which may have been the more highly prized, in consequence of the difficulties which had attended its acquisition, would at last be taken away, unless the fraud, which had been pronounced sufficient to defeat the title of Hite, should be denied. And it is in this state of the case, that after an interval of two years from the filing of the original answer, this answer to the bill of review, denies without explanation, or apology for the previous omission, various facts, of which, although some had been charged in the original bill, and others not therein specified, had been stated in Green's deposition, none were charged in the bill of review. Under these circumstances, it is going far enough, and perhaps too far, to consider this answer as merely putting in issue the allegations of the original bill, so far as to allow the defendant to establish by argument and evidence, their want of truth, but without relieving him from the effect of the inference drawn from a comparison of the first answer with the bill, except so far as to allow him to overcome it if he can, by counter evidence or inference. The last answer cannot be taken as a substitute for the first, nor remove the impression produced by it. In the last answer, the respondent denies, 1st. "that there was any arrangement or agreement between himself and Green, that a sale of the interest of Martha Ann Bowling, should take place in reference to the lot of ground aforesaid, for the purpose of sacrificing said lot." 2d. Denies that they fraudulently agreed that the respondent should sue and obtain judgment on the note of John Bowling, and thus by sale procure the complainant's interest in the lot. 3d. Denies that one half of the lot was worth $1,500. 4th. Denies that respondent proposed to Green to buy complainant's interest in the lot, and to give him therefor $125, to enable him to go to Louisville. 5th. Denies that it was ever agreed between respondent and Green, that Green was to purchase complainant's interest in the lot, and convey it to respondent. 6th. Denies that such agreement or understanding ever took place between them. 7th. Denies that he ever told Green it would not do for him to purchase in one half of the lot. 8th. Avers that the sale of one half of the lot was made *bona fide* to pay his debt

against Bowling's estate—that the sale was fair in every particular, and respondent as highest bidder, purchased and received the Sheriff's deed. 9th. Denies all fraud and combination with Green or otherwise, in reference to the debt, or judgment, or sale, &c.—and 10th. Denies that complainent is owner of any part of said lot, but avers that the same belongs to the respondent.

Having thus stated all the denials which reach the question of fraud, either on the facts alledged in the bill, or on those stated by Green, we might, on the principles which have been stated with regard to the effect of the pleadings, rest the case upon the question, whether upon the evidence oral and documentary, and the fair inferences therefrom, the allegations of the bill, undenied by the original answer, are satisfactorily disproved. But we take the broader question, whether upon the whole case, and giving the least possible effect to the want of denials in the first answer, the allegation of fraud is substantially made out, and in pursuing this inquiry, we shall look mainly to the documentary evidence in the case.

It appears, then, that as early as 1820, Green being indebted to Hite & Johnson, partners, in the sum of about $1,600, executed to them a mortgage upon his interest in lot 94, in Bardstown, which was conveyed to him and his son-in-law, Bowling, in 1818, for the consideration of $2,700, by one Ruth Roark, who had been in possession for many years—that shortly afterwards, suit was brought for the foreclosure of the mortgage, and in 1825, by consent of Johnson, a decree of sale was rendered in favor of Hite alone—after which, without any execution of the decree, the cause continued until June, 1833, when by direction of complainant, it was dismissed, Hite, the only real complainant, having before that time, (in April 1832,) received a conveyance from Green, of his half of the lot, and (in April, 1833,) purchased at Sheriff's sale, under his own execution, the half which had descended from Bowling.

On the 12th of April, 1832, the date of Green's deed to Hite for one half of the lot, the consideration of which was $1,113, one half of Green's debt to Hite, Green executed his written covenant to Hite, whereby, in con-

sideration of $1,113, the balance of said debt, and also $250 in addition, of which $125 were paid in hand, he bound himself to procure a good and sufficient title to the other half of said lot and appurtenances, and convey the same, with general warranty deed, in which his wife should join within one year, in which event Hite was to discharge him from the aforesaid balance, and pay him $125, the other half of said $250; but should he not convey within a year, he was to stand indebted in said balance, to repay the first $125, and not to receive the other $125. On the same 12th of April, 1832, a suit was commenced in the name of Hite & Johnson for the benefit of Hite, against Martha Ann Bowling alone, as heir of John Bowling, upon his note for $58 97, bearing date 17th of February, 1820, in [which year he died; and on the 18th of April, 1832, it having been of course discovered in the mean time, that this suit against the heir alone could not be maintained, a second suit was brought on the same note, in the name of Hite & Johnson, for the benefit of Hite, against Green, as administrator, and M. A. Bowling, as heir. In this second suit, the process was served on the administrator, but returned not found as to the heir; and at the succeeding term the first suit was dismissed, and judgment by default rendered in the second, after appointing Green guardian *ad litem*, for the infant defendant. The execution on this judgment was levied on the undivided half of the lot now in controversy, which having been valued at $1,000 in gold or silver, was on the 8th of October, 1832, put up for sale by the Sheriff, when Green became the purchaser, at $115 98, the amount of the debt, interest, &c., but he did not give bond, &c. as required, stating, as the Sheriff's return says, that there was an understanding between him and Hite. And the return goes on to say, that finding this not to be the case, the lot was again advertised and offered for sale on the 10th of December, 1832, when Hite became the purchaser for the amount due. And this sale having been quashed on motion of the plaintiff, Hite again became the purchaser at the third sale, for $117 79½, on the 8th day of April, 1833, and on the 12th day of June, 1834, the lot not having

been redeemed for the heir, was conveyed to Hite by the Sheriff. This deed appears to have been acknowledged for record on the 14th of June, in Bardstown, where Hite resided, and on the 21st of the same month, Hite took from Geen, at Louisville, where he then resided, his receipt, indorsed on the covenant of the 12th of April, 1832, for $125, expressed to be in full of the within con-tract. It is to be recollected, that by the terms of that contract, Green was to procure and convey the title of the other half of the lot within twelve months, as the condi-tion of receiving the second $125, and upon failure, he was not only not to receive that, but was to pay back the $125 which he had received. Why then did Hite, im-mediately after acquiring the title by means of the note and judgment, and execution sale, pay the second $125? Certainly it is fair to say, that he considered it to be just-ly due, or he would not have paid it. According to the *written terms of the contract on which it was paid,* Hite *was entitled to receive, instead of being bound to pay.* If Hite's acquisition of title was wholly independent of Green's services, active or passive, Green could not, on any principle, have been entitled to this payment, which implying necessarily an acknowledgment that the sum paid was due on the contract, implies also, that the ob-ject of the contract had been substantially attained, and not independently of Green, but by his aid, active or pas-sive, and substantially, if not formally, in the manner contemplated, that is, through the instrumentality of the suit, judgment and execution sale on the note of Bow-ling, held by Hite.

But the connection between the suit of Hite, and the contract with Green, is further shown, by the fact, that on the 8th of June, 1838, the mandate of this Court, re-versing Hite's judgment upon Bowling's note, on the ground that there had been no service of process upon the infant heir, was entered in the Circuit Court, where, by new proceedings in that suit were rendered necessary, and it was apparent that it would not be again undefend-ed. And on the 13th of the same month, which consid-ering Green's being then a resident of Louisville, was probably the earliest opportunity, process in an action of

THOMAS & WIFE<br>vs<br>HITE.

THOMAS & WIFE
*vs*
HITE.

covenant, was sued out against him by Hite, from the Nelson Circuit Court, and served on him on the same day in the county of Nelson, without a declaration being filed, and at the succeeding term a declaration was filed, complaining of a breach of the covenant of the 12th of April, 1832, in not conveying the lot, and the payment of the entire sum of $250, therein named, having been averred, the plaintiff in March, 1839, obtained a judgment for $1,677 49 in damages.

By whose agency the reversal of Hite's judgment was procured, whether by the action of Green or of some other friend of his betrayed ward, does not appear, but possibly this counter movement may have grown out of the fact that Hite seems not to have receipted for the $1,113. Be this as it may, Hite saw in the reversal of the judgment and the entry of the mandate, the commencement of a course which threatened to destroy his title, and he may have regarded this as a virtual breach of the conditions on which Green had been admitted to be entitled to recover payment under the contract between them. As the payment of the sum of $125 upon the contract, immediately after the consummation of his title under the judgment, tends to prove that this was considered as a substantial performance of Green's covenant, so the commencement of the suit alledging a breach of the same covenant, as soon as the reversal of the judgment was entered, tends to show that the reversal of the judgment and the opposition thereby evinced to the course by which the title to the lot had been obtained and might be held, was regarded as a substantial breach of the agreement. And it is to be observed, that the reversal of the judgment was in fact followed by an unsuccessful motion to quash the sale, based apparently on that ground alone, and that pleas were filed on the part of the administrator and heir, on one of which averring that the note had been obtained by fraud, an issue of fact was made up, which, so far as appears in the records before us, has not yet been tried.

The fact just stated, leads to other pertinent inquiries touching the connection between the suit of Hite against Bowling's representatives and the contract of Hite and

Green. Why was the judgment permitted in the first instance to go by default? Why did Green, at the first sale, bid in the property for precisely the amount of Hite's debt and costs? Why did he decline giving the bond as required, if it were not that there was, as he told the Sheriff, an understanding between him and Hite on the subject? And why was not this understanding carried out if it was not because it was discovered that it would not do for Green, the guardian, to purchase his ward's interest under such circumstances, and at such a sacrifice? Hite, in his answer to the bill of review, denies that he ever told Green that it would not do for him to purchase, which fact is not charged in any of the bills but is stated by Green in his deposition, with the further statement that Hite said he must buy himself. And if there were no understanding between them in the first instance, that Green was to buy under the execution as the means of enabling him to convey to Hite, and afterwards, on discovering that this might be dangerous, that Hite should himself make the purchase instead of Green, why did Green, after going from Louisville to Bardstown to attend and bid at the first sale, give up his bid without an effort to secure the property, and leave the subject afterwards exclusively to the management of Hite, without even intimating a desire to a single individual, that the interest of his ward should be preserved from sacrifice? Eighteen or twenty months rent of her share in the lot, would have paid the entire debt; why did not Green ask some friend to take the rent for two years and pay the debt? Nay, Hite himself had had the exclusive possession, acquired from Green, and had rented the lot for about one year, when he made the last purchase. Why was not the Chancellor asked to apply this and the further accruing rent, while Hite should control the possession, to the payment of the debt, and thus to prevent a sacrifice of this infant's patrimony? And why were twelve months suffered to pass without an effort to redeem the lot? There is no pretence that at this time Green was in his dotage, or insensible to the dictates of ordinary feeling or prudence; and no rational answer can be given to these last inquiries, but in the fact that his own interest had been

arrayed against that of his ward, and that his heart had been thus steeled against the promptings of justice and natural effection. It is incredible that he should not have made some exertion to prevent so great an injury to his infant ward and grand child, if his own interest had not been strongly identified with that sacrifice; and with the security furnished by her interest in the lot, we cannot suppose that even a slight effort would have failed of success. But it required no effort, no application to a third person, nothing but the absence of the fraudulent intent to dispoil this infant of her estate by means of this debt. The parties seem not once to have thought that Hite, in receiving the possession of her estate from her guardian, was incurring a debt to her, and was in fact, taking rents and profits which belonged to her. But it did not answer the purpose to appropriate merely the rents and profits of the lot to the discharge of this small demand, which may perhaps have been held up too long and too patiently, to admit of further delay, or to be now satisfied by mere payment.

Hite seems to have had his eye upon this lot for many years. In 1820, the mortgage was taken on Green's interest in it, to secure the debt of $1,600 to Hite & Johnson. In 1825, when the debt considerably exceeded the value of the mortgaged interest, Hite took the exclusive ownership of the debt and mortgage. In April, 1832, he takes half the lot for half the debt, and agrees to give for the other half of the lot the other half of the debt and $250 more, making $1,363, and received immediately afterwards, possession of the whole, which he rented for $150 a year; and in April, 1833, after allowing Green, at the first execution sale, to bid in this half for $115 98, he purchased it himself for $117 79½. How is this great inadequacy of price to be accounted for? The Sheriff says the sale was fair and that he saw nothing unfair in the conduct of Hite. But he does not say that any body but Hite was present. He does not say that the sale was made in front of the Court House, or in any public part of the yard, but that it was made *on that side next to the property sold*, which, for all that appears, may have been out of sight and out of hearing of the crowd usually at-

tending the County Court; and although several wit-
nesses, whose attention might have been attracted by a
public sale of an improved lot in the town, say they never
heard of either of these sales until it was over, not one
is produced besides the Sheriff, who did know of either
before or while it was going on.  But whether the want
of competition, which produced the sacrifice, is to be
attributed immediately to the privacy of the sale or to the
idea among the bystanders, if'there were any, that Hite,
the plaintiff, having purchased Green's half of the lot and
obtained possession of the whole of it from him, had
some peculiar right to a preference in the purchase, either
of these causes of the sacrifice would itself be the natur-
al and probable consequence of an arrangement between
Hite and Green, by which the judgment and execution
were to be made the means of passing the title of Bow-
ling's heir, mediately or immediately to Hite.  And as
this arrangement constitutes the particular fraud alledged
in the bill, we confine our inquiries to it.

*Recurring then to the contract for the acquisition and
conveyance of the complainant's half of the lot, made in
April, 1832, the question is, was this contract fair or
fraudulent? , Did it evince any respect or care for the in-
terest of the complainant, whose estate was its subject,
or was the sacrifice of her interest for the benefit of the
contracting parties its primary object, and how was this
object to be accomplished?*

The complainant, when these parties were thus barter-
ing for her estate, was between twelve and fifteen years of
age, without father or mother, ignorant of what was going
on, and wholly dependent for protection upon Green, her
grand father and guardian, and the administrator of her
father's estate.  Hite knew these circumstances, and that
the other half of the lot which Green was to acquire and
convey within twelve months, belonged to his infant ward;
and for this estate of the infant ward, he is to pay noth-
ing to her or for her benefit, but is to acquit Green of his
debt of $1,113, the same that he had given for Green's
own half, and to pay him besides, $250, which was cer-
tainly not intended for the benefit of the ward or it would
have been applied to the discharge of her debt to Hite

An insolvent
guardian con-
tracting to pro-
cure and convey
to his own cred-
itor the estate of
his ward in dis-
charge of his
own debt and a
specified consid-
eration in addi-
tion thereto, for
his own benefit.
Held fraudulent
on the part of
both parties
thereto and set
aside.
The Chancellor
will look with
close attention
to the conduct of
fiducial agents
appointed by
public authority
and to that end
will give a liber-
al construction
to the pleadings
to enable him to
do justice.

of $110, and which, since the one undivided half of the lot could not have been worth more than the other, would seem to have been in the nature of a premium or bonus to Green, for the part which he was to play in securing to Hite his ward's estate. And how was it imagined or intended that Green should acquire this child's title so as to transfer it to Hite? It could hardly have been contemplated that she should make a deed herself, within the year; and the only other modes which we can conceive of were: 1st. By a sale under the order of the Chancellor, on petition by Green as guardian. And 2d. By a forced sale for the satisfaction of a debt real or fictitious. Now we assume from the long pendency of this debt to Hite, insufficiently secured by mortgage, from this very device contrived to secure Hite and cancel the debt, and from other circumstances, that Green, as he states himself in his deposition, was embarrassed in his circumstances, we may presume that he was unable to pay this debt. The contract then is, that by one of these modes an insolvent guardian shall procure his infant ward's title to her estate, while she is still an infant, and transfer it to his own creditor in discharge of the debt, and for an additional sum paid to himself, for his own use, without securing to the infant owner the benefit of one cent in this consideration, and as we may add, leaving scarcely a probability of her obtaining any substantial or adequate remuneration for the contemplated transfer of her estate. The contract is that this insolvent guardian, unable to give a fair price or perhaps any thing for the lot, unable to meet the responsibilities which he might incur to the infant owner, and interested in procuring at as small a cost as possible, the stipulated means of satisfying this large demand of Hite, shall within twelve months procure her title, either by private arrangement with her, or by petition and sale as her guardian, or by sale under some execution to be obtained against her; as the thing to be done could only have been acsomplished in one of these modes, the parties must, in making the contract have contemplated the adoption of one of them. But it is obvious, upon the slightest scrutiny of the objects of the contract and the relations of the parties, that its pri-

mary effect was to deprive the infant orphan of her only protection and safeguard in these proceedings, by arraying against her the interest and the action of the individual having by law and by nature, the guardianship of her person and property. It is obvious, upon the slightest attempt to follow the steps by which either of the modes of acquiring her title must, in order to insure success, be pursued, that this interested and insolvent guardian who would be ostensible agent in whatever plan should be adopted, being regarded by all as her surest protector, would at once have the best opportunities and be under the strongest temptations to take advantage of his position for the purpose of betraying her interest. It is obvious too, that he could not successfully accomplish the object of paying his debts by means of his ward's estate, but at the sacrifice of her interest, to be obtained by treachery and deception; and it is, therefore, impossible to avoid the conclusion, that the contract itself, by which he is placed in this position, is essentially fraudulent and corrupt, since it invites him, by the strong inducement of self interest, to a violation of his legal and natural duty, and binds him to the pursuit of an object which he can only attain by fraud and iniquity. The contract itself, under all the circumstances attending it, was, in its very inception, unconscientious, immoral, and iniquitous; and if the guardian and grandfather who concerted thus to betray his own blood, is to be regarded as the more guilty of the two, surely he who tempted him to such great iniquity, can scarcely be deemed less guilty, and especially as he may not have acted under the urgency of pecuniary pressure.

But we pursue the inquiry, by what mode did the parties intend that this title should be acquired? We say Hite wanted this lot. He wanted it as an equivalent for a debt due from Green, which otherwise was probably desperate. He wanted it at as small a sacrifice as possible, and by a safe title. To obtain it by conveyance from an infant of fifteen years, to her guardian, would give him a worthless title, doubly insecure, and might besides involve means of influence, from which the contracting parties would have revolted. The mode by the

*Margin notes:*

THOMAS & WIFE
vs
HITE.

A contract with a guardian, by which he must, to comply with it, sacrifice the estate of the ward, is fraudulent as to both parties.

guardian's petitioning the Chancellor might also have been liable to the objection, that the guardian must have sworn that the sale would, in his opinion, be advantageous to his ward, and was required by her interest. And besides, bonds must be executed, and the sale would be under the supervision, and subject to the approval of the Chancellor, and might even be set aside by reversal of his decree. The proceedings might be tardy, and the accomplishment of the object uncertain. For the guardian was to be the real purchaser, and he must purchase at a low price, or the land might ultimately be taken, or a sacrifice incurred by Hite, for payment of the purchase money. Was it then contemplated that the remaining course of subjecting the land to execution should be pursued, as being at once expeditious, and if it could escape condemnation for fraud, passing a safe title? And was it then intended that the sale should be made under a judgment to be obtained by Hite on the note for $58 97? In answer to this question, the fact itself speaks in lieu of all written or uttered words. On the very day, we may say, at the very moment that this contract was made, Hite produces the note of Bowling, for $58 97, which so far as appears, had lain dormant for ten or twelve years, during which, Hite and the administrator, and heir of Bowling, were all in Bardstown, where this lot, and probably other property of Bowling's estate might have been found. Green says he had never heard of it before, though he had advertised as administrator, for debts against Bowling. And that Hite produced it at the time the contract was made, and referred to it as a short way of getting the title. But waiving this testimony of Green. On the very day of the contract, suit was commenced on this note, which had been so long unheard of, and within the year, the lot was sold and purchased three times, for the satisfaction of this debt, which since the reversal of the first judgment, has not yet, so far as appears, been reduced again to judgment. And as to which, the allegation in the original bill, that it was not justly owing, is not yet denied in any of Hite's answers. But although the injustice of the claim might enhance the flagrancy of the fraud, it is not essential to its establishment. And waiving all in-

ferences on that point, we ask whether Hite brought his suit on the note for the purpose of impeding the performance of Green's contract, or for the purpose of aiding it? Did he bring the suit in good faith, simply for the purpose of saving this long neglected debt of $58 97, or did he bring it for the purpose, and as furnishing the means of procuring Bowling's half of the lot, in payment of Green's debt? On what did he expect to levy his execution but on the land? And whether he bought or whether Green bought the lot for the amount of this debt, was not Green necessarily entitled to the benefit of the purchase, to enable him to perform his contract, or to go as performance if Hite should buy? Could Hite, by purchasing in opposition to Green, deprive Green of this means of fulfilling his contract? Did it not necessarily result, from the position of the parties under this contract, that the purchase by Green, and afterwards by Hite, was for their mutual benefit? We think it is too plain to admit of question, that whatever may have been said or left unsaid, it was the intention of Hite, and the understanding of both parties, that this note and the judgment and execution on it, were to be used as the means of obtaining the title to Bowling's moiety of this lot—that to effectuate this object fully, the lot was to be purchased, if practicable, for the amount of the debt, as otherwise it might not pass entire by the sale. And that there was, therefore, a fraudulent contract and combination between these parties, for the purpose of sacrificing the estate of the complainant, and which resulted in the grievance complained of in the original bill.

Having thus shown, with but slight reference to Green's deposition, that the fraud alledged in the original bill, is conclusively astablished by the documentary evidence, as well as by the character of the answers, we shall only remark with regard to that deposition, that however Green may be discredited by the part which he took in the perpetration of this fraud, his statements are, in the main, corroborated by the unquestionable proofs in the case, and that as he had been examined orally in the trials of the ejectment, shortly before and shortly after his deposition was taken, without objection, so far as appears on

THOMAS & WIFE
    *vs*
HITE.

the ground of want of mind, and as the evidence since taken on that subject, establishes rather a sluggishness than a loss of memory, at the date of his deposition, we should not hesitate to refer to his testimony, if it were necessary, as pointing to the proper inference from established facts, or as supplying a link corresponding with the entire chain of circumstances.

In conclusion, we can but suggest, that we presume the bill of review was dismissed solely upon the ground of the supposed insufficiency of that bill; and upon this point our own minds have not been free from difficulty. But the bill of review embodies in itself the original case, and in that case we have found ample justification, and indeed imperative reasons furnished, not only by a view of the private equities between the parties, but also by a consideration of the public interest which is deeply affected by the seduction and treachery of fiducial agents, acting under public appointment, for extending to the bill of review, that liberality of construction which might enable us so to act upon the merits of the case, as at once to do justice between the parties, and to expose and repress a species of imposition to which the most helpless members of the community are peculiarly subject, and against which the law intends, and its tribunals are bound to protect them. The same considerations have led to the protraction of this opinion to a length otherwise wholly unnecessary.

The decree is erroneous, and must be reversed, and the cause remanded, with directions to set aside Hite's purchase, and the Sheriff's deed to him, and to grant the relief prayed for in the original bill, by dividing the lot, and taking an account of the rents and profits of one undivided half of the lot during the time Hite has had the control of it—to be credited, however, by the amount of Hite's judgment npon the note for $58 97, if he has obtained one, which is not injoined. And also, by the value of any lasting and valuable improvements which Hite may have made upon the portion of the lot which may be assigned to the complainant, to be estimated at the time of the division, and also by a ratable proportion of the cost of such current repairs, as being necessary to keep

up the rent, Hite may have made upon the entire lot, rendering a decree for one or the other party as the balance may appear, reserving a lien to Hite, if it should be in his favor, and requiring deeds of partition and release, and a delivery of possession according to the division.

THOMAS & WIFE
*vs*
HITE.

Decree reversed, and cause remanded, &c.

*Grigsby* for plaintiffs : *Hardin* for defendant.